343 P.3d 924

**In re the Matter of Monica J. MIL-INOVICH, Petitioner/Appellee,**

v.

**Anthony D. WOMACK,
Respondent/Appellant.**

**No. 1 CA–CV 12–0657.**

Court of Appeals of Arizona,
Division 1.

Feb. 26, 2015.

See also 2014 WL 7331927.

---

Fromm Smith & Gadow PC, by Sandra J. Fromm, James L. Cork, II, Phoenix, for Petitioner/Appellee.

Dickinson Wright/Mariscal Weeks PLLC, by Marlene A. Pontrelli, Scott A. Holcomb and Robert L. Schwartz, Phoenix, for Respondent/Appellant.

Judge MICHAEL J. BROWN delivered the Opinion of the Court, in which Presiding Judge ANDREW W. GOULD and Judge DONN KESSLER joined.

## OPINION

BROWN, Judge:

¶1 Anthony D. Womack ("Father") appeals the trial court's order denying his petition for modification of child support. The issues we address are whether the court erred in (1) treating Father's receipt of funds withdrawn from a short-term investment as gross income, and (2) calculating Father's child support obligation. For the following reasons, we affirm the court's decision to include Father's withdrawal of funds as gross income and the court's calculation of his child support obligation.[1]

## BACKGROUND

¶2 Monica Milinovich ("Mother") gave birth to a child in 2004. The following year, Mother filed a complaint seeking to establish paternity, custody, and child support. Father's paternity was confirmed, and in January 2007 the parties agreed Mother would have sole custody of the child, with Father paying child support in the amount of $2,901 per month based on Father's monthly gross income of $166,667. At the time of the agreement, Father was winding down his career as a professional athlete. As explained below, a few years earlier, Father and his employer had agreed that a significant portion of his compensation would be deferred for several years.

¶3 Recognizing he would no longer be receiving a new employment contract, Father created two retirement[2] accounts. He used approximately $3.3 million, principally from his deferred compensation funds, to set up a retirement plan that would, in theory, last for the remainder of his life. The first account, consisting of approximately $800,000, was intended to be used by Father, his wife, and their two children for their monthly living expenses ("short-term account"). At its inception, the short-term account generated interest of about $5,000 per month. According to Father's financial advisors, the $800,000 originally deposited into the account was designed to support Father until 2015, under the assumption he would be withdrawing $20,000 per month. However, Father's monthly living expenses have been roughly $40,000. Thus, Father has withdrawn principal from the short-term account at a rate of $35,000 per month.

¶4 The second account, consisting of approximately $2.5 million, is a long-term annuity, and was established with the goal that it would not be accessed until 2015, when the funds from the short-term account would be depleted. By that time, the annuity would have accumulated sufficient value to pay Father a minimum income of $170,000 per year, and would continue to produce income sufficient to support Father and his family for the remainder of their lives without, theoretically, reducing the principal.[3]

¶5 In July 2010, Father sought modification of the 2007 child support award. He alleged that based on his substantially reduced post-retirement monthly gross income of $4,959, his child support obligation should be reduced to $551.16. Although Mother acknowledged that some decrease was warranted, she maintained that Father's new obligation should be approximately $2,300 per month, based on a gross monthly income calculation of $42,000 (roughly the equivalent of Father's withdrawals from his short-term account).

1. Pursuant to Arizona Rule of Civil Appellate Procedure 28(a)(2), we address additional issues in a separate memorandum decision.

2. Consistent with the trial court's order, we describe Father's accounts as constituting part of his retirement plan. But, for purposes of this opinion, we attach no specific legal significance to that description, and we may at times refer to the accounts as an investment plan or financial strategy.

3. Although the trial court's order does not address child support based on the long-term annuity, we include that reference here because of the connection between the short-term account and the long-term annuity as part of Father's overall financial strategy and because the short-term account is a bridge between his salary as a professional athlete and his use of the annuity for the remainder of his life.

¶ 6 After an evidentiary hearing, the trial court rejected Father's position, reasoning that all aspects of a parent's income should be considered to ensure the award is just, and that Father could not claim an income of less than $5,000 per month while voluntarily drawing approximately $40,000 per month from his short-term account. The court therefore included Father's withdrawal of principal from the short-term account as gross income under the Arizona Child Support Guidelines ("Guidelines"). Ariz.Rev. Stat. ("A.R.S.") § 25–320 app. § 5(A).[4] This timely appeal followed.

### DISCUSSION

¶ 7 We review the trial court's ruling on a petition for modification of child support for an abuse of discretion. *Strait v. Strait,* 223 Ariz. 500, 502, ¶ 6, 224 P.3d 997, 999 (App.2010). An abuse of discretion exists when the record, viewed in the light most favorable to upholding the trial court's decision, is "devoid of competent evidence to support the decision." *Little v. Little,* 193 Ariz. 518, 520, ¶ 5, 975 P.2d 108, 110 (1999) (internal quotation omitted). We review de novo the trial court's interpretations of the statutes and guidelines governing child support calculations. *Patterson v. Patterson,* 226 Ariz. 356, 358, ¶ 4, 248 P.3d 204, 206 (App.2011).

### A. Determination of Gross Income

¶ 8 As directed by statute, our supreme court has adopted guidelines to "provide procedural guidance in applying the substantive law" for establishment and modification of child support obligations. A.R.S. § 25–320; Guidelines § 1; *Little,* 193 Ariz. at 521, ¶ 6, 975 P.2d at 111. "The overarching purpose of the Guidelines is to establish a standard of support for children consistent with their needs and the ability of parents to pay, and to make child support awards consistent for persons in similar circumstances." *Engel v. Landman,* 221 Ariz. 504, 513, ¶ 38, 212 P.3d 842, 851 (App.2009) (internal quotation omitted). When applying the Guidelines, the "paramount factor" a court must

consider is the best interests of the child. *Id.*

¶ 9 Whether a parent's voluntary drawdown of principal from an investment account to satisfy living expenses constitutes gross income for child support calculation purposes is not specifically addressed in the Guidelines, nor has an issue of this nature been addressed in any reported decision in Arizona.

¶ 10 In construing the Guidelines, we look first to their plain language as the most reliable indicator of the supreme court's intent. *Mead v. Holzmann,* 198 Ariz. 219, 221, ¶ 8, 8 P.3d 407, 409 (App.1999). We also strive to interpret the relevant section in conjunction with other provisions of the Guidelines and consistent with their overall purpose. *Id.* "[B]oth the governing statute and the Guidelines recognize that a parent's child support obligation is paramount to all other financial obligations, and that a parent has a legal duty to support his or her biological and adopted children." *Little,* 193 Ariz. at 521, ¶ 6, 975 P.2d at 111.

¶ 11 The Guidelines follow the "income shares model," meaning that the amount of child support awarded approximates what "would have been spent on the children if the parents and children were living together," and each parent contributes his or her proportionate share of the total amount. Guidelines (Background). The first step under the Guidelines is to determine the gross income of each parent. *McNutt v. McNutt,* 203 Ariz. 28, 31, 49 P.3d 300, 303 (App.2002). Gross income is broadly defined by the Guidelines to include:

> income from any source, and may include, but is not limited to, income from salaries, wages, commissions, bonuses, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits (subject to Section 26), worker's compensation benefits, unemployment insurance benefits, disability insurance benefits, recurring gifts, prizes, and spousal maintenance. Cash value shall be assigned to in-kind or other non-cash benefits.

**4.** In a subsequent order, the trial court issued its child support worksheet and determined that Fa-

ther's modified child support obligation is $2,348.88 per month.

Guidelines § 5(A). Section 25–320 "does not specify or limit the items that the court may consider in determining a parent's 'financial resources.'" *Cummings v. Cummings,* 182 Ariz. 383, 386, 897 P.2d 685, 688 (App.1994). Therefore, "[b]ecause the Guidelines are based upon assumptions about spending patterns of families at various income levels, gross income for child support purposes is not determined by the gross income shown on the parties' income tax returns, but rather on the *actual money* or *cash-like benefits* received by the household which is *available for expenditures.*" *Id.* at 385, 897 P.2d at 687 (emphasis added).

¶ 12 Father argues the trial court erred in calculating his child support obligation by including, as gross income, the principal he has withdrawn from the short-term account. He asserts that the court failed to recognize that liquidation of principal from an account does not generate income. Father's argument, however, overlooks the unique nature of his investment strategy and his decision to use the principal from the short-term account to meet his ongoing living expenses.

¶ 13 It is undisputed that Father's voluntary drawdown of the principal in his short-term account was part of his larger retirement strategy for investing the funds he received as deferred compensation from one of his previous employers. Father's short-term account was originally funded with $800,000 and designed to be used for his expenses until 2015, when his long-term annuity will have grown enough to provide Father with roughly $170,000 annually for the rest of his life. In accordance with the advice of his financial advisors, Father established the short-term account not only to generate a return on investment, but also to permit him to invade the principal of the account to pay for his monthly expenses. Based on Father's own testimony, his monthly draw from the short-term account depends on his monthly expenses, which on the average are $40,000. Father did not present any evidence, or even suggest, that the child's standard of living would have been lower if Father and Mother and the child were residing together. *See* Guidelines (Background) (stating that a child support award "approximates what would have been spent on the

children if the parents and child were living together"). To the contrary, the record reflects that in such a living arrangement, the child's standard of living would be substantially higher.

¶ 14 Section 5 of the Guidelines states that income from a source that is "not continuing or recurring in nature need not necessarily be deemed" gross income, which also means that income received in a lump sum is not necessarily excluded from gross income. If Father's former employer had paid the deferred compensation over an extended period instead of two payments, Father would have no reasonable argument that those payments would fall outside the definition of gross income. *See Hetherington v. Hetherington,* 220 Ariz. 16, 23, ¶ 27, 202 P.3d 481, 488 (App.2008) ("The receipt of employment benefits that 'are significant and reduce personal living expenses' affects a parent's ability to pay child support and should be considered as income to that parent.") (citing Guidelines § 5(D)). That Father instead received the funds in two lump sums and elected to create his own retirement plan does not convert the funds from gross income to being beyond the scope of the Guidelines. *See Engel,* 221 Ariz. at 514, ¶ 40, 212 P.3d at 852 (explaining that the amount of child support should not be subject to the "investment decisions or whims" of a parent) (citing *In re Marriage of Robinson,* 201 Ariz. 328, 333, ¶ 12, 35 P.3d 89, 94 (App.2001)).

¶ 15 We hold that Father's receipt of principal withdrawn from his short-term retirement account falls within the Guidelines' broad definition of gross income and categorizing these monies as income is both consistent with the overall purposes of the Guidelines and the best interests of the child. *See Strait,* 223 Ariz. at 502, ¶ 8, 224 P.3d at 999 ("Generally, a court may order reasonable and necessary child support based upon the parents' financial resources, and may consider all aspects of a parent's income to ensure the award is just and based on the total financial resources of the parents.") (internal quotations omitted); *Hetherington,* 220 Ariz. at 23, ¶ 26, 202 P.3d at 488 ("Courts throughout the nation have been unwavering in their

attempt to reach an equitable outcome when it comes to determining a party's income for child support, and we attempt to do the same.") (citation and quotation omitted). *Cf. In re A.M.D.*, 78 P.3d 741, 746 (Colo.2003) (holding that inheritance monies saved or invested are not included as gross income for purposes of calculating child support, but monies used by the beneficiary "as a source of income either to meet existing living expenses or to increase the recipient's standard of living," including the drawdown of principal, "should be included in that year's gross income"); *Gardner v. Yrttima*, 743 N.E.2d 353, 356 (Ind.App.2001) (explaining that many states "consider an inheritance as income available for purposes of calculating child support").

¶ 16 Father suggests that including his withdrawals as gross income would lead to inconsistent application of the Guidelines. As an example, he poses a scenario in which a spouse earns $60,000 a year and deposits part of it into a savings account. According to Father, when the spouse later withdraws principal from that account it would not be included as gross income. *See In re Marriage of McGrath*, 2012 IL 112792, 361 Ill. Dec. 12, 970 N.E.2d 12, 15 (2012) (concluding that funds drawn from a savings account should not have been included in the calculation of net income for child support purposes). In that type of situation, Father is likely correct. But there are countless ways of investing for future needs, and determining whether a particular investment vehicle falls within the definition of gross income requires consideration of the Guidelines on a case-by-case basis. Our focus here is on the investment mechanism Father created, which he used to fund his daily living expenses. This investment strategy differs significantly from a savings account.

¶ 17 Father also contends he could have spent all his money, donated it to charity, gifted it to family members, or made poor investments and there would be no funds on which to draw. According to Father, treating his short-term account withdrawals as gross income would encourage parties to waste their income, rather than save it. We decline to presume that parents would take such actions to avoid providing financial support to their children, but if they do, the trial court has the authority to deviate from the Guidelines to prevent an inappropriate or unjust result. *See* Guidelines §§ 3, 20; *see also Little*, 193 Ariz. at 521, ¶ 6, 975 P.2d at 111 (recognizing that a child support obligation is paramount to all other financial obligations); Guidelines § 5(G) (providing that a court, in determining gross income, may take into account "excessive or abnormal expenditures, destruction, concealment or fraudulent disposition of community, joint tenancy, or other property held in common").

¶ 18 Father argues further that the trial court double-counted his deferred compensation, asserting it was fully considered as income when it was earned and was included in the original calculations of his child support obligations in 2007. However, he has failed to direct us to any portion of the record supporting that assertion. In January 2007, the parties stipulated that Father's gross monthly income was $166,667. This figure was based on Father's then-current contract for $2 million per year, "spread [ ] out monthly." As reflected in Father's updated February 2011 affidavit of financial information, Father received income in the amount of $3,870,267 in 2007 and $3,120,573 in 2008, primarily from deferred compensation. Thus, the evidence in the record belies Father's claim. Had the parties intended to include all of the deferred compensation in the 2007 stipulation, Father's gross monthly income would have been much higher than $166,667. Even if all of Father's deferred compensation would have been received and therefore "counted" as part of the 2007 stipulation, it does not necessarily follow that all of that income would be insulated from inclusion as gross income for the purposes of calculating child support in the future. *See* Guidelines § 5 (noting that "gross income" does not have the same meaning as when it is used for tax purposes).

¶ 19 Finally, relying on prior decisions from this court, Father argues that the withdrawals from the short-term account merely constitute an "exchange of assets" and thus are not subject to gross income calculation. *See Jenkins v. Jenkins*, 215 Ariz. 35, 39, ¶ 15,

156 P.3d 1140, 1144 (App.2007) (concluding that sale of farmland was not gross income for purposes of calculating child support because land was exchanged for other like-kind property); *Burnette v. Bender*, 184 Ariz. 301, 304, 908 P.2d 1086, 1089 (App.1995) (concluding that capital gain from sale of commercial fishing boat was not gross income for purposes of calculating child support; only the interest produced from capital gain was includable as gross income). In each of those cases, the transactions at issue did not generate funds that were available for expenditures. Father's investment plan, however, was established for the specific purpose of using a portion of the deferred compensation funds to satisfy his day-to-day living expenses. *See Cummings*, 182 Ariz. at 385, 897 P.2d at 687 (recognizing that gross income includes the actual money received by the household which is available for expenditures).[5] We are therefore not persuaded by Father's assertion that his voluntary use of the principal from his short-term account to fund his living expenses should be treated the same as a one-time property exchange or capital gain.

### B. Upward Deviation

¶ 20 Father asserts the trial court erred by exceeding the maximum amount of income listed in the Guidelines without making a determination that an upward deviation was justified. Section 8 of the Guidelines provides that when the combined adjusted gross income of the parties exceeds $20,000 per month, a combined adjusted gross income of $20,000 "shall be the presumptive Basic Child Support Obligation." A party "seeking a sum greater than this presumptive amount" bears the burden of proof "to establish that a higher amount is in the best interest of the children," considering factors such as (1) the standard of living the child would have had if parents and child lived together, (2) the needs of the child in excess of the presumptive amount, and (3) any significant disparity in the respective percentages of gross income of each parent. Guidelines § 8. Additionally, a deviation from any provision of the Guidelines requires a trial court to make written findings, including a showing of what the child support order would have been without the deviation. *See* Guidelines § 20; *see also* A.R.S. § 25–320(D) ("The amount resulting from the application of these guidelines is the amount of child support ordered unless a written finding is made, based on criteria approved by the supreme court, that application of the guidelines would be inappropriate or unjust in a particular case.").

¶ 21 Although application of the $20,000 combined adjusted gross income cap yields the presumptive Basic Child Support Obligation, this is not the end of the child support analysis. Pursuant to Guideline Section 9, the court must determine the Total Child Support Obligation by adding the cost of the child's medical, dental, and vision insurance, as well as any "appropriate" childcare or education expenses, to the Basic Child Support Obligation.

¶ 22 Here, in the child support worksheet used to calculate Father's revised obligation, the trial court listed Father's gross monthly income as $42,000 and Mother's gross monthly income as $4,400. As a built-in function of the 2011 Child Support Calculator used by the court, the parties' combined adjusted gross monthly income was capped at $20,000, resulting in a Basic Child Support Obligation in the amount of $1,708. The costs of the child's insurance and childcare were then added (and a federal tax credit deducted), resulting in a Total Child Support Obligation

---

5. Father also relies on *Strait*, 223 Ariz. at 503, ¶ 11, 224 P.3d at 1000, as support for his claim that principal withdrawn from a deferred compensation account is beyond the reach of the Guidelines. In that case, a father received an insurance settlement arising from protracted litigation involving significant property damage to his home. *Id.* at 502, ¶ 4, 224 P.3d at 999. The trial court determined the entire amount was includable as gross income for purposes of calculating child support. *Id.* at ¶ 5. On appeal, we concluded it would be improper to consider the entire amount as gross income without offsetting litigation expenses, recoupment of lost capital, or funds needed to remediate the property damage. *Id.* at 503, ¶ 11, 224 P.3d at 1000. We therefore remanded for the trial court to consider the nature and purpose of the settlement proceeds and the net amount received. *See id.* at 504, ¶ 14, 224 P.3d at 1001. The analysis in *Strait* is consistent with our holding here.

in the amount of $2,610. Based on the parties' relative gross monthly incomes, Father was ordered to pay 90% of the Total Child Support Obligation, which is $2,348.88. Applying Guidelines §§ 7 and 9, Father's monthly child support obligation in the amount of $2,348.88 was not an upward deviation. Stated differently, although the trial court listed Father's income as $42,000, the support calculator automatically reduced the parties' combined adjusted gross monthly income to $20,000, complying with Guideline § 8. The Basic Child Support Obligation in the amount of $1,708 corresponded to the capped $20,000 combined adjusted gross income, although the $1,708 amount increased to $2,610 after adding the child's insurance and childcare costs. *See* Guidelines § 20(a) (explaining that a deviation from the Guidelines is an order of "child support in an amount different from that which is provided pursuant to these guidelines...."). Because the Basic Child Support Obligation did not deviate from the Guidelines, and only Father's percentage share of that amount was changed based on his relative income, we find no error.

## CONCLUSION

¶ 23 Because Father's receipt of funds withdrawn from a short-term investment account falls within the definition of gross income, we conclude the trial court properly included these funds as part of Father's monthly gross income when evaluating his request for modification. The court also correctly applied the Guidelines in calculating Father's child support obligation.